UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────────

ROBERT TOBIA and FRANCES TOBIA,

                     Plaintiffs,

    - against -

THE UNITED GROUP OF COMPANIES, INC.,
UNITED GROUP FUND MANAGEMENT, LLC,
MICHAEL J. UCCELLINI and JESSICA F. STEFFENSEN,
as Executor and Executrix, Respectively, of the
ESTATE OF WALTER F. UCCELLINI,
EDGAR R. PAGE and
PAGEONE FINANCIAL, INC.

                    Defendants.
─────────────────────────────────────────────

<u>COMPLAINT</u>

Civil Action No.:  1:15-CV-1208
                    (BKS/DEP)

JURY TRIAL DEMANDED

Plaintiffs Robert Tobia and Frances Tobia, through their undersigned attorneys, hereby allege as follows:

1.      This case arises from Plaintiffs' investment, through Defendants Edgar R. Page ("Page") and PageOne Financial, Inc. ("PageOne" and, with Page, the "Page Defendants"), in United Group Income Fund II, LLC ("Fund"), an investment fund organized by Defendant The United Group of Companies, Inc. ("UGOC").  Plaintiffs' investments represented a substantial portion of their net worth.

2.      Several years after the Plaintiffs made the investment, a United States Securities and Exchange Commission ("SEC") proceeding against Page and PageOne revealed that Defendants had procured Plaintiffs' investment through fraudulent misrepresentations and omissions, and fraudulent acts and devices.  The SEC Proceeding revealed that Defendants UGOC and United Group Fund Management, LLC ("UGFM" and, with UGOC and Walter F.

Uccellini (named herein, as set forth below, through the personal representatives of his estate), the "United Defendants") had secretly agreed to purchase PageOne from Page from funds of investors such as the Tobias to make such payments. The United Defendants never disclosed their secretive incentivizing of the Page Defendants to raise money for them. Indeed, the United Defendants made affirmatively false statements with respect to their compensation of parties such as the Page Defendants who raised money for them.

3.     For their part, the Page Defendants likewise concealed the fraudulent scheme. While actively touting the United investment to the Plaintiffs, the Page Defendants made no disclosure of the secret purchase agreement with the United Defendants. The only disclosures even remotely touching upon compensation by United were vague and misleading. Indeed, as a result of the SEC Proceeding, the Page Defendants' disclosures were found to have been fraudulent.

4.     Had the Tobias known of the secret arrangement between the United Defendants and the Page Defendants, they would have learned the real motivation for Defendants' promotion of the Fund and solicitation of their investments, and they would not have invested ever increasing amounts with United. Instead, as a result of Defendants' acts, the vast majority of Plaintiffs' available investment funds are now tied up in a United fund, and the United Defendants have refused to refund their investment.

5.     As such, the Tobias are entitled to relief to place them in the same position had they never been lured into the United investments, including, but not limited to, rescissionary damages, recoupment of any investment losses, and recoupment of all fees paid to the Defendants.

2

JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to (i) 28 U.S.C. § 1331, as the action arises under federal law as specified herein, and over the supplemental state law claims pursuant to 28 U.S.C. § 1367; and (ii) 28 U.S.C. § 1332, as there is complete diversity of parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims occurred in this District.

THE PARTIES

8.      Plaintiffs Robert Tobia and Frances Tobia are residents of Peru, Vermont.

9.      Defendant The United Group of Companies, Inc. ("UGOC") is a corporation organized under the laws of the State of New York, with its principal place of business in Troy, New York.  UGOC holds itself out as a real estate development and management company.

10.     UGOC established two private investments funds in 2008, the DCG / UGOC Equity Fund, LLC and the DCG / UGOC Income Fund, LLC, to raise money from individual investors.  UGOC formed a third fund, United Group Income Fund II, LLC (the "Fund"), into which the Tobias' investments were made, on or about January 3, 2011.  The Fund is a Delaware limited liability company and private investment fund.  Like the two preceding funds, the Fund was used to raise money from investors to fund UGOC's real estate projects.

11.     Defendant United Group Fund Management, LLC ("UGFM") is a limited liability company organized under the laws of the State of New York, with its principal place of business in Troy, New York.

12.     The members of UGFM are, upon information and belief, UGOC and the Estate of Walter F. Uccellini, a New York citizen.

13.     UGFM has acted as the Manager of the Fund since its inception.  As Manager, UGFM is responsible for the overall management and administration of the Fund, including the acquisition, management and disposition of the Fund's assets.  The management and supervision of the Fund is exclusively vested in the Manager.

14.     At all times relevant to the claims herein, UGOG and UGFM were under common control, and UGOG controlled and directed the affairs of UGFM.

15.     At all times relevant to the claims herein, UGOG and UGFM controlled and directed the affairs of the Fund.

16.     Walter F. Uccellini was the Chairman of UGOC and a member of UGFM prior to his death in 2012, and controlled and directed their affairs.

17.     Defendants Michael J. Uccellini and Jessica F. Steffenson serve as Executor and Executrix, respectively, of the Estate of Walter F. Uccellini ("Estate"), pursuant to an Order to the Surrogate's Court of the State of New York, Albany County dated November 7, 2012.  For purposes of diversity jurisdiction, the Estate is a New York citizen.

18.     Defendant PageOne Financial, Inc. ("Page One") is a corporation organized under the laws of the State of New York, with its principal place of business in Malta, New York.  At all times relevant to this Complaint, Page One was a registered investment advisor.

19.     Defendant Edgar Page ("Page") is a resident of Gansevoort, New York.  From 1981 to 2009, he was a registered representative of a number of registered broker-dealers.  He has been in the investment advisory business since 1984 and, since 2002, has been the principal

owner of PageOne and its Chairman, Chief Executive Officer, Chief Operating Officer, Chief Compliance Officer, Lead Portfolio Manager, and Chairman of its Investment Committee.

20.     At all times relevant to this Complaint, Page was a registered investment advisor. In addition, as PageOne's Chief Compliance Officer, Page was responsible for authorizing any changes to PageOne's client disclosures, including its Forms ADV filed with the SEC.

## FACTUAL ALLEGATIONS

A.     Page's Solicitation of Plaintiffs

21.     In early 2011, the Tobias came to know Page when Frances Tobia met Page at a bookstore.  Page explained, in substance, that he was an investment advisor.  Over time, the Tobias had further discussions with Page and became his clients.

22.     PageOne held itself out as a sophisticated investment advisor.   According to its Form ADV filed with the SEC as of March 31, 2014, PageOne represented that it managed approximately $215 million and that its clients included institutions and high net worth individuals (Exhibit A ¶ 7).

23.     In their initial communications, the Tobias explained to Page their investment objectives, which included principally the funding of their childrens' college expenses and their own retirement.

24.     Moreover, the Tobias explained to Page their limited investment knowledge. Indeed, in 2011, the Tobias completed a PageOne 'Risk Profile Questionnaire' in which they reported, among other things, that their investment experience was "limited."

25.     Although Page and PageOne offered a wide range of traditional investment vehicles, Page quickly began promoting to them substantial investments in a fund created by

UGOC.

26.     Page explained that he was a personal friend of the now-late Walter Uccellini, who was then the Chairman of UGOC.  Page also represented that he had helped Walter Uccellini in the past.

27.     Page had solicited clients into the United funds established in 2008.

28.     Page explained that the Fund invested in real estate, including student housing. He further represented that the Fund was to pay 9% interest annually.

29.     Page also characterized the Fund as a "good investment" and "conservative."

30.     Based upon Page's representations, in March 2011, Frances Tobia invested $50,000 in the Fund.

31.     After the initial investment, Page continued to aggressively solicit the Tobias to invest further in the Fund.  In July 2011, the Tobias invested an additional $200,000.

32.     In September 2011, the Tobias invested twice, once for $227,000 and once for $175,000.

33.     Overall, Defendants induced the Tobias to make the following investments in the Fund:

| March 2011 | Frances Tobia | $50,000 |
| July 2011 | Robert and Frances Tobia | $200,000 |
| September 2011 | Robert and Frances Tobia | $227,000 |
| September 2011 | Robert Tobia | $175,000 |
| Total | | $652,000 |

6

B.     The False and Misleading Disclosures

34.     In connection with the purchase of their interests in the Fund, Plaintiffs were provided with a Private Placement Memorandum for the Fund, dated January 2, 2011 ("PPM").

35.     The United Defendants authored and/or authorized all of the contents of all disclosures to investors, including, but not limited to, the PPM.

36.     The United Defendants caused the PPM to be sent to Plaintiffs directly or through Page and PageOne, utilizing the mails or interstate wires, at or about the times of the Tobias' investments listed below.

37.     UGOC represented in the PPM and elsewhere that it was nationally recognized firm for the development and management of real property and that it was an industry leader in the student, senior, and multi-family housing development sectors.  With regard to the Fund, UGOC represented that it was intended to generate "stable and durable yields and, where possible, the potential for longer-term gains."

38.     Nowhere in the PPM, the Fund Operating Agreement attached to the PPM, or any other document provided to the Tobias in connection with their investment in the Fund did the United Defendants make any disclosures concerning any financial arrangements between UGOC and UGFM on one hand, and Page and PageOne on the other.

39.     With regard to compensation, the PPM included only a general representation as to compensation of Placement Agents (along with a materially similar representation in the Fund Operating Agreement):

> The Manager may retain placement agents (the "Placement Agents") to assist in the private placement of Interests in the Fund.  The Fund will be responsible for paying the placement agent fees of the Placement Agent (the "Placement Agent Fees").

7

> Investors solicited by such persons will be advised of, and asked to consent to, any such compensation arrangement.  In addition, the Placement Agents may, from time to time and in their sole discretion, waive all or part of the Placement Agent Fees in respect of certain other investors.

40.     The only disclosures even remotely touching upon financial arrangements between United and PageOne were set out in Forms ADV that Page and PageOne filed with the SEC.  The Form ADV dated July 31, 2009 contained a vague, general disclosure with respect to United:

> Fee schedule: PageOne Financial does not directly charge the client a fee for this service.  PageOne Financial is compensated by a referral fee paid by the Manager of the Private Fund(s) in which its clients invest.  The management and other fees the client pays to the Private Funds are not increased as a result of Registrant's referral of clients to the Private Funds.  PageOne Financial will typically receive, on an annual basis, a referral fee of between 7.0% and 0.75% of the amount invested by the client in the applicable Private Fund(s).  (Exhibit A at ¶ 21.)

41.     Page and PageOne amended even this vague disclosure, omitting the reference to the percentage range of referral fees and instead making a general statement about compensation as a consultant.  The Form ADV dated September 14, 2010, stated as follows:

> Edgar R. Page, Chairman and Chief Financial Officer of PageOne Financial, is also employed as a consultant to The United Group of Companies, Inc. ("UGOC").  UGOC is a real estate investment and development firm.  Mr. Page is compensated for the consulting services he provides to UGOC.  As disclosed above, PageOne Financial recommends private funds that are managed by UGOC to PageOne's advisory clients for which PageOne receives an advisor fee.  Advisory clients are under no obligation to participate in such investments. (Exhibit A at ¶ 27.)

42.     Remarkably, Page and PageOne went still further when, on March 1, 2011, they amended the Form ADV to remove all references to United and the United Funds. Upon

information and belief, this was the only Form ADV that the Page Defendants provided to the Tobias.

43.     After the Tobias became investors in the Fund in 2011, the United Defendants caused the Fund to send statements, letters and other correspondence to the Tobias, not one of which included any further disclosure of any financial arrangements with Page and PageOne. (Exhibit A at ¶ 31).

<u>The SEC Proceeding</u>

44.     On August 26, 2014, the SEC instituted administrative and cease-and-desist proceedings pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 and Section 9(b) of the Investment Company Act of 1940 against Page and PageOne. ("SEC Order", attached hereto as Exhibit "A".)

45.     On March 10, 2015, following the submission by Page and PageOne of an Offer of Settlement, the SEC issued an Order Making Findings in the SEC Proceeding ("SEC Findings", attached hereto as Exhibit "B").  The SEC Findings resolved the liability portion of the administrative proceeding, which concluded that Page and PageOne had "willfully violated Sections 206(1) and 206(2) of the [Investment Advisers Act of 1940], which prohibit fraudulent conduct by an investment adviser[,]" (Exhibit B ¶ 40), as well as Section 207 of the Advisers Act "which makes it 'unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission . . . or willfully to omit to state in any such application or report any material fact which is required to be stated therein.'" (Exhibit B ¶¶ 41, 42b.)

9

46. In an Initial Decision dated June 25, 2015 ("ALJ Decision", attached hereto as Exhibit "C"), SEC Administrative Law Judge Jason S. Patil imposed remedial sanctions upon Page and PageOne, including (i) revocation of the registration of PageOne as an investment adviser; (ii) a five-year collateral bar on Page's serving as a registered investment adviser; and (iii) disgorgement of $2,184,859.20 against Page and PageOne, with prejudgment interest, jointly and severally.  (Exhibit C at 15.)

47. The SEC Proceeding revealed that Page and PageOne failed to disclose conflicts of interest in connection with the solicitation of investments for the United Defendants.

48. The undisclosed conflict of interest centered on UGOC's incentivizing of Page and PageOne to raise capital for UGOC's funds, through offers to acquire PageOne.

49. In mid-to-late 2008, Page was introduced to Walter Uccellini, who told Page that UGOC was seeking to raise approximately $18 million in order to qualify for approximately $50 million in debt financing committed by a third-party that would allow UGOC to complete the construction of three student housing projects.  (Stipulation of Facts, attached hereto without exhibits as Exhibit "D" ¶¶ 12, 14).

50. After UGOC failed in attempts to raise the funds, on December 8, 2009, UGOC asked Page whether PageOne would be interested in acquiring $18.3 million worth of United preferred stock.  (Exhibit D ¶ 19.)

51. Page told UGOC that he would be agreeable to making those investments on behalf of his clients and committed to purchasing the $18.3 million in UGOC preferred stock using PageOne's clients' assets.  Subsequently, UGOC learned that the TD Ameritrade, the custodian for PageOne's client accounts, required written consent from each investor before

10

investing in private placements such as UGOC's.  (Exhibit D ¶¶ 20-22.)

52.     Alongside the discussions about the acquisition of UGOC preferred stock, Uccellini also entered into discussions to purchase PageOne from Page.  Uccellini offered to purchase PageOne on the same terms as another party was offering to acquire the firm, and offered to hire Page as manager of the new entity's assets.  Uccellini also told Page that a close business associate of his would use his political and business connections to introduce Page to large state, municipal and corporate pension funds, with the intent of bringing $1 billion of assets under the new entity's management.  (Exhibit D ¶¶ 25-26.)

53.     In late 2008, Page entered into an agreement with UGOC whereby UGOC would acquire PageOne.  The agreement encompassed the following:

    a.  UGOC would pay approximately $3 million, to be paid in installments over time.

    b.  The acquisition would not close, and UGOC would not make the final payments of the purchase price, until Page raised approximately $20 million for UGOC's funds. (Exhibit A ¶ 10.)

54.     Sometime prior to April 2010, Page and UGOC agreed to revised terms, whereby UGOC would acquire 49% of PageOne for approximately $2.4 million, a figure that was later increased to approximately $3 million. (Exhibit A ¶ 11.)

55.     Page had begun recommending the UGOC funds to his clients beginning in early 2009.  Between March 2009 and September 2011, Page's and PageOne's clients invested between approximately $13 million and $15 million in the UGOC funds. (Exhibit A ¶ 12.)

56.     Over roughly this same time period, UGOC made installment payments on the acquisition of approximately $2.7 million.  UGOC made these payments directly to Page, PageOne and other entities and persons, at Page's direction. (Exhibit A ¶ 13.)

57.     The approximately $2.7 million in payments by UGOC represented approximately 18% of PageOne's clients' investments in the UGOC funds. (Exhibit A ¶13.)

58.     Critically, Defendants knew that the funds Page was raising were necessary to fund the UGOC's installment payments.  As explained by the SEC, Page and PageOne

> knew (or recklessly disregarded) that the timing of [UGOC's] acquisition payments – which often followed very closely in time behind PageOne clients' investments in the [United funds] – was linked to those investments.  First, Respondents had explicitly agreed to raise money for the [United funds] as a term of the acquisition.  Thus, on at least one occasion, E. Page emailed [UGOC's] founder and Chairman (the "Chairman") to notify him that a PageOne client had invested in the Private Funds and to ask for an acquisition payment.  Moreover, E. Page understood that the Chairman and [UGOC] did not have sufficient liquidity of their own to complete the acquisition of PageOne.  Indeed, E. Page understood that the Chairman was, at the time, selling certain personal assets to keep [UGOC's] business going.  (Exhibit B ¶ 15.)

59.     As further explained by the SEC, during the time period that UGOC was making the installment payments, Page was personally liable on promissory notes to repay the installment payments if the UGOC acquisition did not close:

> The acquisition payments were memorialized as promissory notes from E. Page to [UGOC].  E. Page understood, from the Chairman, that – in the event that the acquisition was consummated – the [UGOC] would cancel the notes.  However, he likewise understood that until the acquisition closed and [UGOC] cancelled the notes, E. Page was personally liable for the notes.  Indeed, E. Page expressed just this concern to the Chairman, writing in an email in January 2010 that, as a result of the acquisition not closing, "I have a large loan 'lliability' [sic] and no assets." (Exhibit B ¶ 16.)

60.     Tellingly, the United Defendants knowingly utilized Page and PageOne to continue to raise capital.

> Over the course of 2010 and 2011, E. Page became increasingly concerned that the acquisition would not close.  He understood that he had not been able to raise the $20 million, a condition precedent for the acquisition.  And, he knew or recklessly disregarded that [UGOG] had not been able to otherwise raise sufficient funds to pay the balance on the acquisition price.  <u>In both 2010 and 2011, the Chairman made increasingly urgent appeals to E. Page to assist [UGOC] in fund-raising, for example, telling him of his "need" to raise money and saying that he "desperately need[ed]" E. Page's help in doing so.</u>  (Exhibit B ¶ 36 (emphasis supplied).)

61.     Particularly notable is the timing of the Tobias investments in the Fund.  As explained above, the Tobias made their investments in the Fund in response to Page's multiple solicitations from March 2011 through September 2011, the same time period during which Defendants were desperately seeking additional funds to keep their undisclosed acquisition scheme going.  Indeed, as the SEC explained:

> Respondents' clients made their last investments in the [United] Funds in September 2011, shortly after [UGOC] made its last payment to E. Page.  (Exhibit B ¶ 37.)

62.     Eventually, the plan for UGOC to acquire PageOne collapsed, and UGOC demanded payment on the promissory notes:

> In April 2013, the Fund Manager wrote to E. Page seeking repayment of the promissory notes of $2,751,345 in principal and $933,486.32 in interest on the grounds that the acquisition had not closed.  (Exhibit B ¶ 39.)

C.     <u>The False Statements and Omissions and Fraudulent Acts</u>

63.     The United Defendants knowingly and recklessly engaged in the scheme to lure investors, including the Tobias, into the Fund, using Page and PageOne as their agent and alter ego, through material false statements and omissions and fraudulent acts and devices, including, but not limited to, the fraudulently concealed scheme of payments to Page and PageOne.

64.     As explained above, neither UGOC nor UGFM disclosed any facts to the Tobias concerning any financial arrangement with Page or PageOne.  In particular, and among other things, the United Defendants falsely stated, with regard to Private Placement Agent fees, "Investors solicited by such persons will be advised of, and asked to consent to, any such compensation arrangement."

65.     In fact, the United Defendants knowingly concealed several material facts, including, but not limited to the fact that (i) UGOC had entered into an agreement to acquire PageOne; (ii) UGOC had already made substantial installment payments pursuant to the acquisition agreement; (iii) UGOC and UCFM were utilizing proceeds of Page's and PageOne's clients' investments to fund the on-going installment payments; (iv) in the absence of the proceeds of Page's and PageOne's clients' investments, UGOC lacked funds to make the installment payments; and (v) Page and PageOne faced massive financial liability if the acquisition did not close.

66.     The United Defendants also knew that neither Page nor PageOne had disclosed any of the facts concerning the financial arrangement in the Forms ADV, or otherwise, or recklessly regarded such non-disclosure.

67.     The United Defendants knew that the disclosures to the Tobias in the Forms ADV, the PPM and the other documentation provided in connection with their investments in the Fund were false, or recklessly disregarded the possibility that such representations were false when made.

68.     The United Defendants were also aware of the timing of the Tobias' investments (by virtue of their receipt of documentation and ultimately the proceeds associated with the

14

Tobias' investments) and actively utilized Page and PageOne to continue to raise money for their own benefit and to fund the installment payments to Page and PageOne.

69.     The United Defendants had a motive to continue the fraudulent solicitation of investors such as the Tobias through the false and misleading disclosures, in that, among other things, (i) they needed cash to fund the installment payments under the acquisition agreement; (ii) they needed cash to fund intended investments in real estate ventures in which the United Defendants  intended to participate, and from which the United Defendants stood to profit on both the investments and management and other fees; and (iii) the investments in the Fund would generate additional management and other fees for the United Defendants.

70.     Likewise, Page and PageOne knowingly concealed several material facts, including, but not limited to, the fact that (i) UGOC had entered into an agreement to acquire PageOne; (ii) UGOC had already made substantial installment payments pursuant to the acquisition agreement; (iii) UGOC and UCFM were utilizing proceeds of Page's and PageOne's clients' investments to fund the on-going installment payments; (iv) in the absence of the proceeds Page's and PageOne's clients' investments, UGOC lacked funds to make the installment payments; and (v) Page and PageOne faced massive financial liability if the acquisition did not close.

71.     Page and PageOne knew that the disclosures in the Forms ADV, the PPM and the other documentation provided in connection with their investments in the Fund were false, or recklessly disregarded the possibility that such representations were false when made.

72.     Page and PageOne had a motive to continue the fraudulent solicitation of investors such as the Tobias through the false and misleading disclosures, in that, among other

things, (i) they knew that the United Defendants needed cash to fund the installment payments under the acquisition agreement; (ii) Page and PageOne would enjoy economic benefits if the acquisition closed; and (iii) if the acquisition did not close, Page and PageOne faced massive liabilities under the promissory note.

      D.    <u>Damages and Relief</u>

73.    Had the Tobias been informed of the financial arrangements between the United Defendants and the Page Defendants, they would not have made any of their United investments.

74.    As ALJ Patil found, "Page recommended investments with a high degree of risk, and Page's clients ran the risk of substantial losses."  (Exhibit C at 5.)  ALJ Patil further found:

> While [Page and PageOne] are correct that the poor performance of the [United] Funds is not at least exclusively their fault, it is certainly their fault that their clients were that their clients were recruited to invest in the [United] Funds under false pretenses and without upfront disclosure of a significant conflict of interest. . . . Further, Page acknowledged that making a full and complete disclosure of the conflict of interest  - including that he was working on selling at least some of PageOne while routing funds to the buyer – would have made clients "extremely nervous" and would be "too dangerous" – presumably because the clients would no longer want to do business with [Page and PageOne]. . . . (Exhibit C at 5 [citations omitted]).

75.    Not only are the Tobias stuck with an investment they would not have chosen had they known the truth, but their funds are now locked up under the control of the United Defendants, who refuse to release them.  Under the terms of the operating agreement governing the Fund, the Tobias are unable to liquidate their investment without the approval of the United Defendants.

76.    In fact, the Tobias' investments in the Fund constitute the vast majority of their available investment funds.

77.     Indeed, prior to commencing this action, the Tobias demanded a refund of their investments in the Fund, together with all accrued dividends and interest.  The United Defendants refused to return any of the Tobias' funds.

78.     The Tobias' investment in the fund was procured through unlawful conduct and is subject to rescission.

79.     Moreover, the Tobias have been subjected to unlawful commissions and charges in connection with their investments.

80.     In addition, upon information and belief, all or some of the Tobias' investments in the Funds were diverted by the United Defendants to make installments payments to Page and PageOne, as explained above.

81.     In addition, upon information and belief, the Fund has suffered substantial investment losses.

F.      Defendants' Concealment and Plaintiffs' Diligence

82.     As explained above, Defendants concealed their fraudulent conduct.  The Tobias bring these claims within two years of the discovery of Defendants' fraud through the exercise of reasonable diligence.

83.     In addition, the Tobias are entitled to equitable tolling of any limitations periods applicable to any of their claims, given Defendants' fraudulent concealment of their fraudulent conduct.

AS AND FOR A FIRST CAUSE OF ACTION
(Section 10(b) and Rule 10b-5 - All Defendants)

84.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs numbered "1" through "83" herein with the same force and effect as if set forth herein at length.

85.     Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. „ 78a et seq. and Rule 10b-5, 17 C.F.R. § 240.10b-5.

86.     Plaintiffs have thereby been damaged.

<u>AS AND FOR A SECOND CAUSE OF ACTION</u>
(Section 20 – United Defendants and Page)

87.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs numbered "1" through "86" herein with the same force and effect as if set forth herein at length.

88.     UGOC was at all relevant times a 'control person' of UGFM pursuant to Section 20(a) of the Act and exercised actual control over the matters giving rise to the violation of Section 10(b), in that UGOC was, upon information and belief, the manager of UGFM.

89.     Walter F. Uccellini was at all relevant times a 'control person' of UGOC and UGFM pursuant to Section 20(a) of the Act and exercised actual control over the matters giving rise to the violation of Section 10(b), with regard to both UGOG and UGFM.

90.     Defendants UGOC and the Estate of Walter F. Uccellini are liable as control persons for all damages caused by any primary violations of UGFM.

91.     Defendant Estate of Walter F. Uccellini is liable as a control person for all damages caused by any primary violations of UGOC and UGFM.

92.     In addition, UGOG, UGFM and Walter F. Uccellini were at all relevant times control persons with respect to Page and PageOne, in that they exercised actual control over them and their solicitation of investors such as the Tobias.

93.     Defendants UGOG, UGFM and the Estate of Walter F. Uccellini are liable as control persons for all damages caused by any primary violations of Page and PageOne.

94.     Defendant Page was at all relevant times a control person with respect to PageOne, in that he exercised actual control over PageOne and the solicitation of investors such as the Tobias.

95.     Defendant Page is liable as a control person for all damages caused by any primary violations of PageOne.

### AS AND FOR A THIRD CAUSE OF ACTION
(Advisers Act – Page Defendants)

96.      Plaintiffs repeat and reallege each and every allegation contained in Paragraphs numbered "1" through "95" herein with the same force and effect as if set forth herein at length herein.

97.     At all relevant times, Page and PageOne were investment advisors pursuant to the Investment Advisers Act of 1940 ("Advisers Act").

98.     Page and PageOne violated Section 206(1) of the Advisers Act.

99.     Pursuant to Section 215 of the Advisers Act, all contracts, transactions and payments made through Page and PageOne, including, but not limited to, those pertaining to Plaintiffs' investment in the Fund, are subject to rescission.

### AS AND FOR A FOURTH CAUSE OF ACTION
(Fraud – All Defendants)

100.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs numbered "1" through "99" herein with the same force and effect as if set forth herein at length herein.

101.    Defendants knowingly, and with intent to defraud, made representations and omissions that were materially false and misleading, upon which Plaintiffs justifiably relied.

102.     Plaintiffs have suffered damages as a result of the Defendants' fraud.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Breach of Fiduciary Duty – All Defendants)

103.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs numbered "1" through "102" herein with the same force and effect as if set forth herein at length.

104.     At all times relevant to the claims herein, the United Defendants and the Page Defendants held a special relationship of trust with the Tobias and acted as fiduciaries to the Tobias.

105.     As fiduciaries, the United Defendants and the Page Defendants owed the Tobias a duty of loyalty and a duty of care.

106.     The United Defendants and the Page Defendants breached their fiduciary duties to the Tobias.

107.     The Tobias have been damaged by the breaches of fiduciary duty.

108.     Page and PageOne breached their fiduciary duties to the Tobias.

109.     The Tobias have been damaged by the breaches of Page and PageOne.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Aiding and Abetting Breach of Fiduciary Duty – United Defendants)

110.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs numbered "1" through "109" herein with the same force and effect as if set forth herein at length.

111.     The United Defendants knew of the breaches of fiduciary duty of Page and PageOne to the Tobias.

112.     The United Defendants provided substantial assistance to Page and PageOne in connection with their breach of fiduciary duty to the Tobia.

113.    The United Defendants are liable for all damages caused by the breaches of Page and PageOne.

### AS AND FOR A SEVENTH CAUSE OF ACTION
(Negligent Misrepresentation – All Defendants)

114.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs numbered "1" through "113" herein with the same force and effect as if set forth herein at length.

115.    As set forth above, Defendants owed Plaintiffs fiduciary duties.

116.    Defendants were charged with the obligation to disclose material facts regarding Plaintiffs' funds.

117.    Defendants, while acting as fiduciaries, and for payment in the form of management fees, supplied fraudulent and inadequate representations and information to the Plaintiffs with respect to their investments in the Fund.

118.    Plaintiffs reasonably relied upon such representations and information and have have suffered damages.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
(Unjust Enrichment – All Defendants)

119.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs numbered "1" through "118" herein with the same force and effect as if set forth herein at length.

120.    As the Page Defendants and the United Defendants failed to disclose to the Tobias the nature of the relationship between them, the Tobias entrusted $652,000.00 to the Defendants for investment purposes.

121.    As a result of this transfer, both the Page Defendants and the United Defendants received commissions, fees, investment gains and other economic benefits associated with

21

investing the Tobias' funds, and were thus enriched at the Tobias' expense.

122.     Because of Defendants' failure to be forthright and honest with the Tobias regarding the circumstances surrounding the investment, it would be against equity and good conscience to allow the Defendants to retain the investment funds transferred by the Tobias or any commissions, fees, investment gains and other benefits associated with such investment.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Breach of Contract – Page Defendants)

123.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs numbered "1" through "122" herein with the same force and effect as if set forth herein at length.

124.     In or around February 2011, the Tobias entered into a contract with the Page Defendants for investment advisory services.

125.     Such contract included a duty of good faith and fair dealing.

126.     The Page Defendants failed to perform their obligations under the contract.

127.     As a result of this breach, the Plaintiffs were injured.

## AS AND FOR A TENTH CAUSE OF ACTION
### (Constructive Trust – All Defendants)

128.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs numbered "1" through "127" herein with the same force and effect as if set forth herein at length.

129.     The United Defendants and the Page Defendants should not in good conscience be permitted to retain title to any funds entrusted to them by the Tobias.

## AS AND FOR A ELEVENTH CAUSE OF ACTION
### (Rescission – All Defendants)

130.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs numbered "1" through "129" herein with the same force and effect as if set forth herein at length.

131.    Plaintiffs lack an adequate remedy at law.

132.    Plaintiffs are entitled to an order of rescission against the United Defendants and the Page Defendants with respect to (i) their funds invested in the Fund, including all dividends, interest and investment gains; and (ii) commissions and fees charged to them.

AS AND FOR AN TWELFTH CAUSE OF ACTION
(Negligence – Page Defendants)

133.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs numbered "1" through "132" herein with the same force and effect as if set forth herein at length.

134.    As the Tobias' investment advisor, the Page Defendants owed a duty to the Tobias to, among other things, recommend suitable investments and prudently invest and manage their investments.

135.    The Page Defendants breached their duties to the Tobias.

136.    As a result of this breach, the Plaintiffs have suffered economic damages.

PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the Defendants as follows:

1.    On all causes of action, a judgment against all Defendants, jointly and severally, for all compensatory damages, including, but not limited to, rescissionary damages, in an amount to be determined at trial;

2.    On all causes of action, an order of rescission against all Defendants in favor of Plaintiffs encompassing no less than the following: (i) the full principal invested by Plaintiffs in the Funds; (ii) all accrued interest and divided on Plaintiffs' investment in the Funds; and (iii) all fees charges to Plaintiffs by Defendants;

23

3.      On all causes of action, against all Defendants, punitive damages in an amount to

be determined at trial;

4.      All of Plaintiffs' costs and disbursements;

5.      All of Plaintiffs' attorneys' fees and expenses; and

6.      Such other and further relief as the Court may deem just and proper.

<u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 8, 2015.
       Albany, New York.

                                        **TABNER, RYAN AND KENIRY, LLP**

                                        <u>**s/ Thomas R. Fallati**</u>
                                        Thomas R. Fallati
                                        Bar No. 515267
                                        *Lead Attorney for Plaintiff*
                                        Tabner, Ryan and Keniry, LLP
                                        18 Corporate Woods Boulevard, Suite 8
                                        Albany, New York 12211
                                        Telephone: (518) 465-9500 Ext. 307
                                        Facsimile: (518) 465-9112
                                        Email: trf@trklaw.com

24